J-S31031-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: Y.A.P., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: N.N.L., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1546 EDA 2022 |

Appeal from the Decree Entered May 16, 2022
In the Court of Common Pleas of Bucks County Orphans' Court at No(s):
2021-A9094

BEFORE: BOWES, J., NICHOLS, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.: **FILED OCTOBER 4, 2022**

Appellant N.N.L. (hereinafter "Mother") appeals from the Decree entered in the Court of Common Pleas of Bucks County Orphans' Court Division on May 16, 2022, granting the Petition filed by the Bucks County Children and Youth Social Services Agency (hereinafter the "Agency") to involuntarily terminate Mother's parental rights to her minor child Y.A.P. (hereinafter "Child").[1] Following a careful review, we affirm.

The orphans' court detailed the relevant facts and procedural history herein as follows:

> Y.A.P. was born [i]n March [] 2011. See N.T. 11/05/2021, p. 24. Mother's own actions were the catalysts that brought Child under the care of the Agency. Id. at p. 30. The initial referral of Child to the Agency was in October 2018, when concerns were raised as to Child's welfare following an instance of alleged

_____

[*] Former Justice specially assigned to the Superior Court.
[1] Child was born in March of 2011.

physical abuse at the hands of Mother. Id. As a result, Mother was criminally charged with and subsequently pled guilty to one count of Endangering the Welfare of a Child[2] and one count of Simple Assault.[3]  She was sentenced to two years of probation.[4] Id. at pp. 79-80.

Child came into care of the Agency on October 11, 2018, pursuant to an Emergency Order issued by the Bucks County Dependency Court. Id. at pp. 73-74. A Shelter Care Order was entered the next day. Id. at p. 74. A subsequent dependency hearing occurred on November 26, 2018, wherein Child was adjudicated dependent. Id. Child has been in the care of the Agency since that date more than three and one-half years ago. Id.

After Child was adjudicated dependent, the Agency sought to implement a Family Service Plan with the ultimate goal of reunifying Mother and Child. Id. at p. 75. This plan primarily focused on having Mother acknowledge the incident that brought Child into the care of the Agency, and to provide Child with the support she needed going forward. Id. On February 1, 2019, Ashley Lorenz ("Ms. Lorenz"), an Agency caseworker involved in this case from December 2018 until March 2019, met with Mother to review the Family Service Plan. Id. at pp. 65, 76. At the meeting, it was also requested of Mother that she provide income verification. Id. at p. 76. Mother refused to sign the Family Service Plan and was also unwilling to provide income verification. Id.

On March 15, 2019, a meeting took place with the Agency, Mother, Child's foster parents, Child's guardian *ad litem*, and Mother's legal counsel. Id. The purpose of this meeting initiated by the Agency was to review the reunification objectives of the Family Service Plan and to discuss Child's progress.[5] Id. at pp. 76-77. Again, Mother refused to sign the Family Service Plan. Id. at p. 78.

On April 25, 2019, Desiree Mullen ("Ms. Mullen"), a supervisor in the permanency division of the Agency, and Kristen Griego ("Ms. Griego"), the caseworker involved in this matter from March 2019 until June 2020, went to Mother's residence in another attempt to discuss the Family Service Plan. Id. at pp. 64-65, 68, 78. While at the residence, Ms. Mullen attempted to discuss with Mother the reasons for Child's removal from her care, referring to the physical abuse perpetrated by Mother against Child. Id. at p. 78. Mother, once again, refused to review the Family Service Plan. Id. Mother also denied that the allege[d] abuse occurred. Id. at p. 79-80. She also accused Ms. Mullen of "overcommunicating" with her about changes that had occurred to the visitation schedule.

Id. Mother then proceeded to "kick [ Ms. Mullen] out of her home." Id. at pp. 78-79. Later that day, Mother left a voicemail with the Agency stating that Ms. Mullen was no longer allowed in her home because Ms. Mullen had not been "understanding of her migraine that she had that day." Id. at p. 81.

On June 21, 2019, there was a meeting between Ms. Griego and Mother where another attempt was made to have Mother sign the Family Service Plan. Id. at p. 82. Mother, once again, refused to sign the Plan.

In early November 2019, Mother communicated to the Agency that she would not meet with their workers unless her attorney was present at the meetings. Id. From November 2019 into early December 2019, the Agency attempted to contact Mother concerning her request to meet with the Agency. Id. Mother was unresponsive to the Agency's attempts to have a meeting. Id. However, a meeting was ultimately scheduled and held on December 13, 2019. At this meeting, Mother did acknowledge that "she needed to work on her relationship with [Child]." Id. at pp. 82-83. In April 2020, the Agency sent Mother a letter concerning the objectives of the Family Service Plan. Id. However, the Agency did not receive a response or any communication regarding the contents of its letter. Id. at p. 83.

During the time Child has been under the care of the Agency, numerous therapeutic services have been offered to both Mother and Child.[6] Id. at p. 84. One such therapist was Tedd Bradford ("Mr. Bradford") of K/S Services, who remained actively involved in this matter from December 2019 until August 2020.[7] Id. at pp. 84, 86. Mr. Bradford's involvement was for the purpose of "work[ing] on" the relationship between Mother and Child. Id. at p. 85. More specifically, Mr. Bradford sought to facilitate an apology from Mother, to Child, regarding the physical abuse incident that initially brought Child into the care of the Agency. An additional goal was having family therapy sessions between Mother and Child. Id. at pp. 85-87.

On July 8, 2020, there was a meeting among Mother, Mother's attorney, Mr. Bradford, and Child's individual therapist. Id. at p. 88. At this meeting, the Agency explicitly informed Mother what must occur in order for her to be reunified with Child. Id. Mother was informed that in order to move forward with reunification, she would be required to acknowledge the past abuse and to apologize to Child for what happened, for the purpose of rebuilding trust with Child. Id. at pp. 88-89. Mother was also told that for family therapy sessions to commence with Mr. Bradford, she would be required to acknowledge and apologize

for the abuse so that Child would feel comfortable attending family therapy sessions with Mother. Id. at p. 99. While Mother initially agreed to engage in reunification therapy with Child, during an August 14, 2020 home visit, Mother recanted her agreement and told the Agency that she would not write an apology letter because she did not feel comfortable putting anything in writing. Id. at pp. 90-91.

At a September 3, 2020 meeting with Mr. Bradford, Child's individual therapist, and Mother, Mother was once again, explicitly told that she needed to be honest with Child about the physical abuse, and that she needed to apologize to Child. Id. at p. 91. Mother purportedly replied that she had already agreed to apologize to Child and that "she didn't understand why the issue was continuing to be brought up." Id. at p. 92. On January 12, 2021, there was a virtual meeting among the Agency's clinical team, Mother, and Mother's attorney. Id. at p. 94. The Agency, yet again, explained to Mother that she needed to acknowledge the past abuse, provide Child with an apology, and provide assurances to Child that it would not happen again. Id. At this meeting, Mother indicated that if Laura Reynolds ("Ms. Reynolds"), another family therapist at K/S Services, believed that an apology was necessary to move forward, then Mother would provide the apology. Id. at p. 94.

During a February 19, 2021 telephone call between Mother and the Agency, it was reiterated that in order to move forward with the goal of reunification, Mother needed to acknowledge the abuse, apologize to Child, and assure Child that it would not happen again. Id. at p. 95. Despite Mother stating that she was ready to apologize, Mother failed to provide an apology to Child. Id. Approximately one month later, on April 13, 2021, Mother lamented "about how everybody wants her to apologize to [Child] but no one... has ever apologized to her for the things that [have been] said to her." Id. at pp. 95-96.

On April 22, 2021, Child's case was transferred to Deborah Selby ("Ms. Selby"), a caseworker in the Agency's permanency division. Id. at pp. 134-35. At that point, the Agency was still considering two options with regard to permanency for Child; that is, reunification with Mother or adoption. Id. at p. 135. Ms. Selby was also aware that the Agency was requiring Mother to acknowledge and take ownership of the physical abuse that she had directed toward Child. Id. at p. 137.

On April 29, 2021, Mother told Ms. Selby that she was not to contact her by phone, and that instead, Ms. Selby should only contact her via email, with Mother's attorney copied on the

communications. Id. at p. 138. Mother also banned Ms. Selby from entering her residence. Id. At the time Ms. Selby took over the case, Mother was scheduled for visitation once a week for four hours, with family therapy facilitated by Ms. Reynolds to occur during the last hour of the visit. Id. at pp. 139-40. In April 2021, Mother attended three out of the four visitations offered. Id. at p. 141. From May 2021 to September 2021, Mother only attended seven of the 20 visitation opportunities offered. Id.

In early May 2021, a conference was held among various members of the Agency to discuss the direction of Child's case, since it had been nearly three years since Child had come into the care of the Agency, and little progress toward reunification had been made on the case. Id. at p. 170. On May 7, 2021, the Agency sent an email to Mother's attorney, indicating that the Agency would support the goal of reunification if Mother "would agree to acknowledge, take ownership of the abuse, apologize to [Child] and reassure her that this abuse would not occur again. (The Agency) offered that this could be done in the presence of [Child's guardian ad litem]." Id. at pp. 171-72. The Agency proposal was articulated as follows:

> Good Afternoon [Mother's attorney]:
>
> I have spoken with [the Agency] and I am authorized to make the following proposal to you on behalf of your client, [Mother].
>
> For almost the entirety of this case, the Agency has advised you and previous counsel in correspondence and your client and her attorneys, during court proceedings, that there were two things that [Mother] would need to do for the Agency to support reunification with [Child].
>
> The first was for her to unconditionally apologize to [Child] for what she did. The second was to provide assurances to [Child] that she would never do anything inappropriate again. [Mother] was never willing to do so.
>
> At this point in time the Agency prepares to make the proposal one last time and here are the specifics:
>
> > 1. An in-person meeting will be set up between [Mother], [Child], [Child's guardian *ad litem*] and no one else at a neutral location.

- 5 -

2. There will be no discussion, no questions, no comments and no statements other than what [Mother] will say to [Child].

3. [Child] will be told, before the meeting, that [Mother] wants to say some things to her and it is expected that she will listen.

4. [Child] will be told, before the meeting, that she will be unable to ask any questions or make any comments, as will her mother.

5. [Mother] will say the following and only the following: "[Child] I have thought carefully and I want to say two things to you — First, I am truly sorry that I have hit you in the past. Second, I promise that I will never hit you again with my hands or anything else."

6. After this statement is made, all parties will leave the meeting.

If [Mother] is in agreement and follows through, the Agency will recommend to the Court that [Child] be returned to [Mother's] custody and that the case be closed.

See Exhibit CY5. Mother's counsel responded to the email that Mother was unwilling to participate in the scenario proposed by the Agency. N.T. 11/05/2021, p. 173. Thereafter, on August 30, 2021, the Agency filed a petition to terminate Mother's Parental Rights and Duties pursuant to Sections 2511(a)(2), (5), and ( 8) of the Adoption Act.

While the Agency's petition was pending, Mother continued to be offered visits with Child. During a September 24, 2021 visitation between Mother and Child, Patricia Samuel ("Ms. Samuel"), a case aide for the Agency, observed and memorialized the following interaction between Mother and Child[8]:

[Mother] was on time for the visit. Upon this worker's arrival, [Mother] and her two children, [Child's Sister] and [Child's Brother] came downstairs so that this worker could take them to the supermarket.

While in the supermarket, [Mother] purchased food and snacks for the children and the following dialogue took place. [The Child who is the subject

of these proceedings] said: I didn't get one. Referring to a bag of donuts.

[Mother] replied: Where do you live? And then she repeated: Where do you live?

[Child] replied: With you. [Mother] then replied: No, you don't. You live with [a foster family]. The food that I'm buying are for them, referring to [Child's Sister] and [ Child's Brother], because they live with me. You should be asking [your foster family] to buy your snacks because they are getting child support from me along with money from the Agency. Be grateful you're getting this bag of [donuts].

While on the way back, [Mother] mentioned an upcoming TPR hearing, and the following dialogue took place. [Mother] stated: [Child], do you want to come back home with me or do you want to be adopted? [Child] replied: Be adopted.

…

[Mother] replied: That's okay. You go ahead and let them adopt you. I bet the Agency didn't tell you that when you are adopted, you won't see me or your sister and brother again. You are running around, acting like you are crazy and telling these people that you are scared to come home. Did you think about this -- do you think about how this is affecting your sister and brother?

Okay. You keep listening to these people and letting them tell you that if you are adopted you will be able to see your mother and siblings. These people don't care about you, and I keep telling you that. Oh, and just so you know, you are just a paycheck to them. Wait until they adopt you and they are no longer receiving money from you or the Agency. Do you see how you are dressed now? Is that what the fuck you want. Tell them be careful what they wish for and you need to be careful of what you wish for. Oh, and if you think that you are going to be

adopted and still be able to come home--come to my house, you got me fucked up. Since you don't give a fuck, guess what? I don't give a fuck either.

[Ms. Samuel] said: [Mother], just so you know, I'm going to have to document this conversation. [Mother] replied: Go ahead. I don't give a fuck. I want you to tell them exactly what I said. I might write Debbie a letter.

When we arrived back to [Mother's] house, [Child's Sister] was crying. Mother stated: Why are you crying? Turn around and show your sister [(referring to Child)] your tears. Do you see any tears on her face?

[Child's Sister]: Mommy, please give [Child] one more chance. And [Mother] replied: I'm not keeping [Child] from coming home. Why don't you ask her why she's not coming home.

[Child's Sister] replied: [Child] will you please change your mind and come home? And [Child] replied: Maybe. [Child's Sister]: Mommy, she said maybe.

[Mother] replied: Is that answer good enough for you? [Child's Sister] replied: Yes. [Mother] said: This will be the last visit. I do not want any more visits.

[Ms. Samuel] asked [Child's Sister] and [Child's Brother] to give their sister [(Child)] a hug and a kiss. Once [Ms. Samuel and Child] left, [Ms. Samuel] spoke to [Child] to help her unpack what just happened. [Child] yelled out: No child should be afraid to get hit by their mother.

This worker continued talking to [Child] and allowed her to vent. This worker drove [Child] to McDonald's and she ate dinner before returning to her foster home.

> Upon arrival at the foster home, this worker briefed
> [Child's foster mother] so that she could have a talk
> with [Child] if necessary.

N.T. 11/05/2021, pp. 55-62.

Evidentiary hearings regarding the termination of Mother's Parental Rights took place on November 5, 2021, January 24, 2022, March 30, 2022, and April 26, 2022.[9] During the course of the hearings, the Court heard evidence from Agency caseworkers, social workers, a family therapist, a former foster parent, and Mother.[10] On May 12, 2022, this Court signed a Decree terminating Mother's Parental Rights and Duties concerning Child. On June 9, 2022, Mother filed a timely Notice of Appeal to the Superior Court from our May 12, 2022 Decree.

─────

[2] 18 Pa. C.S. § 4304(a)(1).

[3] 18 Pa. C.S. § 2701(a)(1).

[4] Mother pled guilty to these charges on September 17, 2019. See N.T. 11/05/2021, p. 80; see also Criminal Docket number CP-09-CR-0002145-2019.

[5] During this meeting, a miscommunication occurred between Mother and Ms. Lorenz. During the meeting, Ms. Lorenz referenced an incident where Child made statements about wanting to harm herself. Ms. Lorenz made these statements with the belief that the foster care agency had previously relayed this information to Mother; however, it had not. Mother became understandably upset and subsequently "accused Ms. Lorenz of being a liar and that she was providing gross miscommunication and that she did not want to work with her." N.T. 11/05/2021, p. 77. Ms. Lorenz was subsequently removed from the case.

[6] In addition to having an individual therapist and a family therapist, Child received trauma-focused cognitive behavioral therapy and wrap-around services from several different service providers, beginning in October 2018. N.T. 11/05/2021, pp. 123-27.

[7]Mother subsequently requested that Mr. Bradford be removed because she felt "it was a waste of time, he was dragging his feet with starting the family therapy sessions and that he didn't communicate enough with her." Id. at p. 86.

[8] Mother has two additional children, a 4-year-old son and an 8-year-old daughter, who are not in the custody or care of the Agency.

[9] Mother sought, and was granted, a continuance of the January 24, 2022 Hearing because the individual who was to watch her two younger children was exposed to COVID-19, and, as a result, she did not have childcare. Mother failed to appear at the April 26, 2022 Hearing, apparently out of fear of being arrested on an outstanding Domestic Relations bench warrant. N.T. 04/26/2022, p. 5.

[10] Mother participated in her direct examination at the March 30, 2022 hearing; however, she was not cross-examined by other interested parties due to her failure to appear at the April 26, 2022 hearing. We further note that facts of record pertinent to the needs and welfare of Child are recited throughout Sections IVb and IVc of this Opinion, pages 14-22.

Orphans' Court Opinion, filed 7/7/22, at 1-10.

The orphans' court granted the Agency's termination petition pursuant to 23 Pa.C.S.A. §§ 2511(a)(2), (5), (8) and (b). Mother filed her Concise Statement of Matters Complained of on Appeal on June 9, 2022, and the orphans' court filed its Opinion pursuant to Pa.R.A.P. 1925(a) on July 7, 2022.

On appeal, Mother presents the following issues for this Court's review:

1. Did the trial court erroneously grant Bucks County Children & Youth Social Services Agency's petition to involuntarily terminate the parental rights of Appellant pursuant to 23 Pa. C.S. § 2511(a)(2) when the Agency failed to prove the grounds thereunder by clear and convincing evidence?

2. Did the trial court erroneously grant the Agency's petition to involuntarily terminate the parental rights of Appellant pursuant to 23 Pa. C.S. §2511(a)(5) when the Agency failed to prove the grounds thereunder by clear and convincing evidence?

3. Did the trial court erroneously grant the Agency's petition to involuntarily terminate the parental rights of Appellant pursuant to 23 Pa. C.S. § 2511(a)(8) when the Agency failed to prove the grounds thereunder by clear and convincing evidence?

- 10 -

4. Did the trial court erroneously move its inquiry to the needs and welfare of the child pursuant to 23 Pa. C.S. §2511(b) and erroneously find that termination would best meet said needs and welfare when the Agency failed to prove grounds for involuntary termination of parental rights pursuant to the grounds alleged under 23 Pa. C.S. § 2511(a)(2), ( 5) and ( 8) by clear and convincing evidence?

5. Did the trial court erroneously find that the needs and welfare of the child as contemplated under 23 Pa. C.S. §2511(b) were best met by terminating the parental rights of Appellant?

Brief for Appellant at 5.

In support of her first claim, Mother states that she completed her probation and has remedied the abuse which caused Child to be removed from her care. She believes her reformation is evident in the fact that she is caring for her other two children and "no abuse continues toward Child." Brief for Appellant at 15. She explains one of the therapists who had worked with the family, Laura Reynolds, LCSW, testified that "she (Ms. Reynolds) did not want to orchestrate an apology because it would not be true." *Id*. (citing N.T. 3/30/22, at 85-86). Appellant stresses that Ms. Reynolds also testified Child seems to enjoy Mother's company and that she believed further family therapy would be useful. *Id*. (citing N.T., 3/30/22 at 100, 114).

In her next two issues, Mother asserts the Agency failed to prove the grounds for termination under Subsections (a)(5) and (8) of Pa.C.S.A. § 2511. Mother reiterates that the reason for the Child's removal, the physical abuse, no longer exists. She also relies upon Ms. Reynolds' observations that Child was affectionate with her siblings during visits, did not appear fearful of

- 11 -

Mother, and would benefit from additional therapy. Brief for Appellant at 17-19.

In support of her final two issues, Mother posits the orphans' court erred when engaging in an analysis under 23 Pa.C.S.A. § 2511(b), because the Agency had failed to prove grounds for termination under Section 2511(a). She argues that ending contact between Mother and Child and between Child and her two siblings would fail to serve Child's needs and welfare. Brief for Appellant at 19-21.

This Court's standard of review of a ruling on the involuntary termination of parental rights is as follows:

> [A]ppellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. This standard of review corresponds to the standard employed in dependency cases, and requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but it does not require the appellate court to accept the lower court's inferences or conclusions of law. ... An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion; we reverse for an abuse of discretion "only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill will." ... "We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings." However, "[w]e must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence."

*In re Adoption of C.M.*, 255 A.3d 343, 358-59 (Pa. 2021) (citations omitted).

When considering a petition to terminate parental rights, an orphans' court must balance a parent's fundamental "right to make decisions

concerning the care, custody, and control" of his or her child with the "child's essential needs for a parent's care, protection, and support." ***Id.***, at 358. The court also must consider Subsections 2511(a) and (b) independently:

> Termination of parental rights is controlled by statute. ***See*** 23 Pa.C.S.A. § 2511[.] Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

***In re L.M.***, 923 A.2d 505, 511 (Pa.Super. 2007) (case citations omitted).

> Our Supreme Court has explained:

> [T]he burden of proof is upon the party seeking termination to establish by "clear and convincing" evidence the existence of the statutory grounds for doing so. "[C]lear and convincing evidence is defined as testimony that is so 'clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.'"

***In re Adoption of C.M.***, 255 A.3d at 358 (citations omitted).

Where the orphans' court terminates parental rights pursuant to multiple subsections of the Adoption Act, this Court need only agree with the orphans' court as to any one subsection of Section 2511(a), as well as Section 2511(b), to affirm a termination of parental rights. ***In re Adoption of C.J.P.***,

114 A.3d 1046, 1050 (Pa.Super. 2015). As previously stated, the orphans' court herein terminated Mother's parental rights under Subsections 2511(a)(2), (5), (8), and (b). We will analyze the court's decision to terminate pursuant to Subsections 2511(a)(2) and (b), which provide as follows:

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> * * *
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> * * *
>
> **(b) Other considerations**.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

With regard to termination under Section 2511(a)(2), this Court has determined:

[T]he following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa.Super. 2003) (citation omitted).

"The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal[,] as well as incapacity to perform parental duties." *In re S.C.*, 247 A.3d 1097, 1104 (Pa.Super. 2021) (citation omitted).

[W]hen a parent has demonstrated a continued inability to conduct his [,or her] life in a fashion that would provide a safe environment for a child, whether that child is living with the parent or not, and the behavior of the parent is irremediable as supported by clear and competent evidence, the termination of parental rights is justified." "A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous.

*Id.* at 1105 (citation omitted).

In the instant case, we first address whether the orphans' court abused its discretion by terminating Mother's parental rights pursuant to 23 Pa.C.S.A. §2511(a)(2). The court has determined that Mother's refusal to act in an appropriate and reasonable parental capacity toward Child, and her refusal to remedy the situation, has caused Child to have been without essential parental

- 15 -

care. Orphans' Court Opinion, filed 7/7/22, at 15. The court notes that Mother refused on three occasions to review and sign the Family Service Plan and repeatedly "obstinately and inexplicably refused to provide the acknowledgement, apology, and assurances necessary to promote rebuilding trust with Child, so that a loving parent-child relationship could be promoted and restored." *Id*. at 16.[2]

The orphans' court also stresses Mother's refusal to cooperate with school officials' repeated requests to complete an evaluation has prevented Child from having access to necessary educational services. *Id*. at 16-17. The court concludes:

> We heard no credible, reasonable explanations for Mother's failure to comply with the Agency's proposed Family Service Plan, her failure to acknowledge the abuse, her refusal to provide Child with an apology, and her refusal to provide assurances to her understandably anxious Child that it would not happen again. Nor did we hear a reasonable explanation for Mother's failure to sign the educational evaluation forms so that Child has access to the

_____

[2] Significantly, the orphans' court explained:

> We want to be clear that we are not holding that a parent must necessarily follow every dictate of the Agency in order to avoid termination of parental rights. In this case, the reunification predicate of acknowledgement, apology, and assurance was a reasonable consensus decision of mental health professionals which was intended to address the clear needs and welfare of Child- emotionally as well as physically. Mother's continued failure to cooperate with reasonable Agency directives was harmful to Child in multiple significant ways, including Child's needs for stability and security, and for a relationship with Mother which would be built upon a foundation of trust and love.

Orphans' Court Opinion, filed 7/7/22, at 16 n. 12.

educational services she requires. Mother's continued refusal to perform even the most basic parental duties regarding Child has been to the detriment of not only Child's educational well-being, but to her emotional health as well. Accordingly, based on the evidence and testimony provided, and consistent with pertinent statutory and decisional law, we found that there was ample evidence which clearly and convincingly compelled us to terminate Mother's parental rights as to Child, pursuant to Section 2511(a)(2).

Orphans' Court Opinion, filed 7/7/22, at 17.

Our review of the record supports the orphans' court's findings. Ms. Mullen testified that when she began working on this case in 2019, the primary objective of her fellow caseworkers and her was reunification. Most vital to this objective was Mother's need to accept responsibility for the abuse she perpetrated upon Child and to develop an understanding of the impact it had had upon Child. N.T., 11/5/21 at 72-73. While the testimony of therapist Laura Reynolds (N.T., 3/30/22, at 68-173) suggests that Mother did make some progress toward reunification with Child, we agree with the orphans' court, sitting as the factfinder, that Mother has failed to demonstrate consistent improvement.[3]

_____

[3] The orphans' Court stated:

Ms. Reynolds expressed her opinion that during therapy sessions she facilitated with both Mother and Child present, trust and communication had improved in 2020-2021. Given Ms. Reynold's apparent view of her role as an advocate for Mother, and given the overwhelming evidence which contradicted her opinion, we found her testimony to be unpersuasive.

Orphans Court Opinion, filed 7/7/22, at 20, n. 13.

- 17 -

At meetings which occurred on February 1, 2019; March 15, 2019; April 25, 2019; June 21, 2019; December 13, 2019; and in a letter in April of 2020, the Agency, through various caseworkers, attempted to have Mother review and execute the Family Service Plan, although she refused. *Id*. at 65, 76-83. Indeed, Mother admits "there were times throughout the pendency of this matter when Mother refused to sign the Agency's Family Service Plans." However, Mother makes numerous excuses for her refusals, including being upset at learning Child had threatened to harm herself in one instance and suffering from a migraine at another time. *See* N.T. 3/30/22, at 176-199; Brief for Appellant at 7-8.

Mother also admits she sees no need to apologize according to what she characterizes as a "pre-written script," and instead claims she stated repeatedly to caseworkers that she would apologize in a "therapeutic setting." Brief for Appellant at 9-10. She also represents that she would only apologize if Ms. Reynolds thought an apology was necessary. N.T. 11/5/21, at 94. Notwithstanding, Mother does not deny that she never made atonement. This evinces that Mother continues to see her noncompliance as nothing more than a refusal to follow a "script"; however, her inaction is a barrier to her ability to move forward in developing a trusting and loving relationship with Child.

The record further demonstrates that Mother's repeated and continued neglect and refusal to comply with the Agency's permanency goals, as well as her failure to accept responsibility for her role in Child's physical, mental and

emotional injuries, have resulted Child being without essential parental care, control, or subsistence necessary for her physical or mental well-being. *See* 23 Pa.C.S.A. § 2511(a)(2); *In re Adoption of M.E.P.*, 825 A.2d at 1272. Further, the conditions and causes of Mother's neglect and refusal cannot or will not be remedied. *See id.* Ms. Mullen testified that she believes she and her colleagues did everything they could to work towards reunification between Mother and Child. N.T. 11/5/21, at 97.

Indeed, Mother's refusal to accept responsibility for her past actions and repair her relationship with Child is reflected in her own arguments before this Court. Mother posits that Child's difficulties most likely stem from the behavior of others, including the Agency and Child's current foster parents. Additionally, Mother suggests that Child may have suffered physical abuse from someone else when she was four years old and that this abuse is responsible for her anxiety. Mother also complains she was not granted a concession to attend the final hearing in this matter virtually, because she feared she would be arrested on an outstanding warrant related to child support, which resulted in many aspects of "her side of the story" lacking in the record.[4] Brief for Appellant at 10-11.

_____

[4] We note that Mother presented her direct testimony at the March 30, 2022. The orphans' court rightly explained its reasons for continuing with the hearing as follows:

*(Footnote Continued Next Page)*

We also do not find persuasive or relevant Mother's repeated references to the fact that she is parenting her other two minor children. This Court's focus herein is on the needs and welfare of Child whom she has plead guilty to abusing, a crucial fact Mother is unwilling to acknowledge. The manner in which Mother parents Child's siblings is inapposite to a determination of whether Mother has taken the steps necessary for reunification with Child.

Based on the foregoing, we discern no abuse of discretion by the orphans' court in concluding Mother's conduct warranted termination pursuant to Section 2511(a)(2).

Next, we consider whether termination was proper under Section 2511(b). Section 2511(b)

> focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child." ... "Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis.

_____

So I do want to say, though, it is very, very regrettable that Mother chose—made an active choice not to be here today. And at this point, everyone understand, the [c]ourt cannot be and will not be complicit in the fugitive status of an individual, and that's what I was being asked to do, to allow her to testify virtually. That would absolutely render the [c]ourt complicit in the fugitive status. I will not do that.

N.T., 4/26/22, at 31.

- 20 -

*In re K.R.*, 200 A.3d at 969, 982 (Pa.Super. 2018) (*en banc*) (citation omitted).

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, ... the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*Id.* (citation omitted).

The extent of any bond analysis necessarily depends upon the circumstances of each, particular case. *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa.Super. 2008). A court should consider "whether a parent is capable of providing for a child's safety and security or whether such needs can be better met by terminating a parent's parental rights." *Interest of L.W.*, 267 A.3d 517, 524 (Pa.Super. 2018).

In addition, our Supreme Court has stated "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *In re T.S.M.*, 71 A.3d 251, 268 (Pa. 2013). "In weighing the difficult factors discussed above, courts must keep the ticking clock of childhood ever in mind. Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly." *Id.* at 269.

- 21 -

Here, the orphans' court found that Child has been in placement for over three years and with her foster family since February of 2019. Child has conveyed to her guardian ad litem a "steadfast desire" not to be returned to Mother and a desire for her counsel to advocate for that outcome "any and every way possible." Orphans' Court Opinion, filed 7/7/22, at 21 (citing N.T., 11/05/21, at 30). Child considers her foster parents "mom and dad," and they support her in her schoolwork, ensure she receives medical treatments, and enable her to build friendships. The orphans' court also stressed the fear Child harbors at the thought of being returned to Mother. *Id*. at 22. The orphans' court concluded:

> Regrettably, the record is replete with clear and convincing evidence that Mother has not made sufficient reasonable or responsible strides toward adequately being able to parent Child. Mother's continued unwillingness and refusal to place Child's needs over her own, and to take the steps necessary to reunify with Child, are of great concern. When these considerations are taken into account, along with Child's needs for permanence and stability, this Court is constrained to firmly conclude that it is in the best interests of Child to grant the Agency's Petition to Terminate Mother's Parental Rights.

Opinion at 22-23.

The certified record supports the orphans' court conclusion that termination was proper under Subsection 2511(b). Mother admittedly has refused to cooperate with the Agency in furthering the goals set forth in the Family Service Plan, and instead she has made numerous excuses for her refusal to apologize to Child for her past conduct. Rather than work toward fostering a bond with Child, Mother's words and actions have caused

dissension as is evidenced by the profanity-laced exchange documented by Ms. Samuel; during a supervised visit, Mother refused to purchase the snacks for Child as she was buying for her other children, told Child that she is only a source of money for her foster parents, and placed the blame for Child's situation and that of her siblings squarely on Child's shoulders. N.T., 11/5/21, at 54-62.

Furthermore, in lieu of ensuring Child's educational potential is maximized, Mother has inexplicably thwarted school officials' attempts on multiple occasions to put her in a proper placement, which would necessitate testing her as a gifted child. N.T. 11/5/21, at 184-187.

Finally, Child is happy with her current foster family who has provided for her educational, medical, physical, and emotional needs and has attempted, unsuccessfully, to work with Mother to facilitate visitation and phone calls. *Id*. at 192, 200, 204. The family continues to be an adoptive resource for Child. *Id*. at 192; N.T., 3/30/22, at 7. On this record, we conclude the orphans' court did not abuse its discretion in finding termination of Parents' parental rights was consistent with Child's developmental, physical, and emotional needs and welfare pursuant to Section 2511(b).

Accordingly, because we conclude that the orphans' court did not abuse its discretion by involuntarily terminating Mother's parental rights to Child

pursuant to Section 2511(a)(2) and (b), we affirm the Decree of the orphans'

court.

Decree affirmed.

Judgment Entered.

_Joseph D. Seletyn_
Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/4/2022